**Reginald S. COLE, Jr., Plaintiff,**

v.

**JANSSEN PHARMACEUTICALS, INC., Defendant.**

**Case No. 15–CV–57**

United States District Court,
E.D. Wisconsin.

Signed 07/13/2017

Reginald S. Cole, Jr., Waupun, WI, pro se.

Ellen A. Presby, Nemeroff Law Firm, Dallas, TX, for Plaintiff.

Gerardo H. Gonzalez, Jean Marie Crahan, Gonzalez Law LLC, Milwaukee, WI, for Defendant.

## ORDER DENYING MOTION FOR RECRUITMENT OF COUNSEL

William C. Griesbach, Chief Judge

On January 16, 2015, Plaintiff Reginald S. Cole, Jr., a prisoner currently serving a sentence in a Wisconsin prison, filed this 42 U.S.C. § 1983 action against a defendant he identified as "Risperdal Manufacturer." (ECF No. 1.) By way of background, Risperdal is a drug used to treat mental health conditions and is manufactured by Janssen Pharmaceuticals, a subsidiary of Johnson & Johnson. According to an online news report, there are currently more than 5,500 lawsuits pending in the Complex Litigation Center of the Philadelphia Court of Common Pleas alleging injuries arising out of the use of Risperdal. The cases generally allege that Risperdal use caused boys and young men to undergo gynecomastia, a condition in which a male develops female breast tissue. As of April 10, 2017, eight of the cases had gone to trial with verdicts evenly split between defendants and plaintiffs, including a $77 million plaintiff's verdict in one case. *See Philadelphia Flooded With New Risperdal Lawsuits; Trials Split But Include Massive Verdict*, FORBES, https://www.forbes.com/sites/legalnewsline/2017/04/10/philadelphia-flooded-with-new-risperdal-lawsuits-trials-split-but-include-massive-verdict/#28fea6fc6318 (last visited July 11, 2017).

In his complaint, Cole alleged that he had been prescribed Risperdal for mental health issues while in prison and suffered side effects including pain and swelling of his breasts, dizziness, nausea, fatigue, head and stomach pain, breathing difficulties and vomiting blood. Cole claimed he was in need of surgery and requested damages of no less than $2.2 billion. (*Id.* at 4–6.) Construing the complaint as a product liability action against Janssen Pharmaceuticals, the assigned judge screened the complaint, granted Cole's motion to proceed without prepayment of fees, and allowed the case to proceed, presumably under the court's diversity jurisdiction, although the state or states of Cole's and Janssen's citizenship are not alleged. (ECF No. 22.) Cole filed an amended complaint on May 27, 2015 that named Janssen as the defendant but still failed to allege the respective citizenship of the parties. On September 23, 2015, Janssen filed an answer to the amended complaint in which it admitted only its name and that the case was open, denied all other allegations and asserted 54 affirmative defenses. (ECF No. 58.)

The case was reassigned to me on March 15, 2017, and I have requested supplemental filings of the parties to confirm the existence of federal jurisdiction under 28 U.S.C. § 1332. Currently before the court is the plaintiff's motion to reconsider his request for the appointment of counsel. For the reasons set forth below, the motion will be denied. Because the facts of the case present a number of difficulties with the application of this circuit's law on recruitment of counsel to cases of this nature, however, and because the court's decision on this motion may well be dispositive of the entire case, the court's reasoning will be set forth at some length.

### BACKGROUND

On June 5, 2017, Cole filed a motion for reconsideration of his motion to appoint counsel. (ECF No. 140.) According to Cole, he needs an attorney to present evidence at trial and help secure certain documents he is unable to obtain, such as his medical records. Cole also states that he needs an attorney to adequately respond to the defendant's pending motion for summary judgment. Specifically, Cole states that he needs to present evidence, help secure certain medical records at $0.15 per page, and obtain sealed records.

The record reflects previous efforts by both Cole and the court to obtain counsel to represent him in his lawsuit. Sometime in the Fall of 2013, Cole saw a personal injury law firm's television commercial stating that persons who took Risperdal and developed gynecomastia might be entitled to substantial compensation. (ECF No. 134, Def. PFOF ¶ 28.) Cole apparently contacted two law firms that represent plaintiffs in Risperdal litigation, both of whom declined to take his case based on their initial investigation and/or review of records. The first firm notified Cole of its decision in February of 2014 and the second in June of 2015. (ECF No. 43-1 at 2, 3.) At a status conference held by the previously assigned judge on March 9, 2016, Cole reported that a law firm named "Risperdal Attorney at Law" may represent him, but a telephone call placed to the number he provided was answered by a representative of Kennedy Hodges LLP, a law firm in Houston, Texas, who advised the court the firm had no record showing that it represented Cole. Shortly thereafter, Attorney Ellen Presby of the Nemeroff Law Firm in Dallas, Texas called in and offered to represent Cole pro bono if Janssen would consent to have the case transferred to California state court where she had another Risperdal case pending. (ECF No. 71.) Janssen declined to consent to transfer the case, but Attorney Presby nevertheless agreed to represent Cole for the limited purpose of obtaining his pharmacy records. (ECF No. 74.)

Attorney Presby obtained Cole's records and provided a report to the court. (ECF No. 85, 86.) At an October 26, 2016, status conference, Attorney Presby was discharged after she advised the court she could no longer represent him in this litigation. The court noted at that time that it had put forth its "best efforts" to find legal counsel for Cole but was unsuccessful. Stating that it was not in any position to assist Cole further, the court suggested he continue to seek counsel on his own. (ECF No. 96 at 3.)

Shortly after the case was reassigned to me, Cole filed another motion for appointment of counsel, which I denied without prejudice noting that I would reconsider his request when the defendant filed a dispositive motion. (ECF No. 128.) Janssen filed its motion for summary judgment on May 30, 2017, and on June 5, 2017, Cole filed his motion for reconsideration asking again that the court recruit an attorney to assist him in bringing his case.

In its brief filed in support of its motion for summary judgment, Janssen argues that Cole's case is fatally flawed for several reasons. First, Janssen contends that Cole's own medical records show he has never been diagnosed with gynecomastia. According to Janssen, the nurse from the prison Health Services Unit (HSU) who examined Cole for gynecomastia noted the exam was "unremarkable", there was "no nipple dimpling or discharge" and "no palpable lumps." (ECF No. 133 at 4–5.) Based on her examination, Nurse Waltz concluded that there was "no objective evidence of gynecomastia or breast abnormality." Nurse Waltz added that Cole was a "questionable historian." (Id. at 5.)

As for the other alleged side-effects that Cole attributes to his ingestion of Risperdal, Janssen argues that the medical records show Cole complained of most of the same symptoms at times when he was not taking the medication. Again according to Janssen, Cole's records show he was first prescribed Risperdal in May 2007. The prescription was discontinued two months later, in July 2007, because Cole refused to take the medication. He was again prescribed Risperdal in September 2007, but discontinued it in December 2007, again because he refused to take it on multiple occasions. He was taking it again for a two-month period between February and

April 2008, but then did not resume taking the drug until December 2012, when he was prescribed generic Risperdone after he told his psychiatrist that he was familiar with and comfortable with Risperdal. Janssen notes it had lost its patent protection for Risperdal in June 2008, and shortly thereafter generic Risperidone became widely available from other drug companies. By the time Cole resumed using the drug in December 2012, Janssen had stopped marketing brand-name Risperdal. Given this history, Janssen argues Cole cannot prove its drug caused his alleged injuries after 2008 and any injuries he suffered from it before that time would be barred by the applicable statute of limitations. (*Id.* at 2–4.)

I now turn to the law governing motions for recruitment of counsel.

## ANALYSIS

■ Civil litigants do not have a constitutional right to have an attorney represent them. *Jackson v. County of McLean*, 953 F.2d 1070, 1071 (7th Cir. 1992) ("We begin with the fundamental premise that indigent civil litigants have no constitutional or statutory right to be represented by counsel in federal court."). The rule is different for one accused of a crime. When the government accuses an individual of a crime and seeks to deprive him of his liberty as punishment for the commission of such crime, the accused does have a right to counsel under the Sixth Amendment, and counsel must be provided at public expense if the accused cannot afford to hire counsel on his own. *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Civil litigants, on the other hand, are not in any danger of losing their liberty. Civil litigation is usually about money.

■ But even though civil litigants do not have a constitutional or statutory right to appointed counsel, district courts have the discretion to recruit attorneys to represent indigent litigants in appropriate cases pursuant to 28 U.S.C. § 1915(e)(1). The Seventh Circuit has held that district judges can be held to have abused that discretion when they fail to do so under certain circumstances. *Pruitt v. Mote*, 503 F.3d 647, 653 (7th Cir. 2007) (en banc). *Pruitt* is the Seventh Circuit's *en banc* effort to clarify the standards district courts must use in exercising their discretion in deciding whether to recruit counsel for pro se litigants.

■ *Pruitt* makes clear that as a threshold matter, litigants must make a reasonable attempt to secure private counsel on their own. *Id.* at 654. As the above discussion shows, Cole has made a reasonable effort to find private counsel to represent him. The threshold requirement is thus met here. Once this threshold burden has been met, the court must address the following question: "given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Id.* at 654–55 (citing *Farmer v. Haas*, 990 F.2d 319, 321–22 (7th Cir. 1993)). In essence, the district court is to recruit counsel if "the difficulty of the case—both factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Id.* at 655. The district court must consider "both the difficulty of the case and the pro se plaintiff's competence to litigate it himself." *Id.* at 649.

In assessing a pro se plaintiff's competence to litigate his own case, *Pruitt* observed that there are "no fixed requirements." *Id.* at 655. The court noted that the district judge will normally consider the plaintiff's literacy, communication skills, educational level, and litigation experience. Evidence bearing on the plaintiff's intellectual capacity and psychological history is also relevant. *Id.* The question is

not merely whether the pro se litigant can present his case at trial, however. In *Navejar v. Iyiola*, the court emphasized that the proper inquiry is not whether the pro se plaintiff is competent to *try* the case, but whether he is competent to litigate his claims, which includes conducting the discovery and motion practice that normally attend litigation. 718 F.3d 692, 696 (7th Cir. 2013). For this reason, the very fact of his incarceration is a factor the district court must consider in assessing the competence of the plaintiff to litigate his case. *See, e.g., Henderson v. Ghosh*, 755 F.3d 559, 565 (7th Cir. 2014) ("Henderson's limitations were exacerbated by his incarceration, which further restricted his ability to investigate the facts."); *Junior v. Anderson*, 724 F.3d 812, 815 (7th Cir. 2013) ("[A] plaintiff's inability to investigate crucial facts by virtue of his being a prisoner ... is a familiar ground for regarding counsel as indispensable to the effective prosecution of the case."). In addition, the fact that an inmate receives assistance from a fellow prisoner is not a factor the court should consider in deciding whether to recruit counsel since one inmate cannot assist another in taking depositions, (though few if any inmates have the financial resources needed to hire a court reporter or other officer before whom a deposition must be taken, *see* Fed. R. Civ. P. 28), or at trial. *Henderson*, 755 F.3d at 565.

Similarly, in evaluating the complexity element, the court observed in *Pruitt* that there were "no hard and fast rules." 503 F.3d at 655. Other than noting its observations in previous decisions that cases "involving complex medical evidence ... are typically more difficult for pro se plaintiffs," *id.* at 656, *Pruitt* provided no specific examples of the type of factual or legal difficulty that should move a district court to appoint counsel. Instead, the court more broadly noted, "[t]he inquiry into plaintiff competence and case difficulty is particu-

larized to the person and case before the court." *Id.* Subsequent decisions by the court suggest that many, if not most, prisoner cases could be considered sufficiently complex in light of the inherent mental, educational, and physical limitations and barriers most prisoners face so as to require recruitment of counsel.

In *Santiago v. Walls*, for example, the court characterized presenting evidence of the defendants' state of mind required for an Eighth Amendment violation as "one of the more challenging aspects of section 1983 litigation," in concluding that the district court abused its discretion in denying the plaintiff's motion for recruitment of counsel. 599 F.3d 749, 762 (7th Cir. 2010). As noted by the dissent, since this factor is present in many, if not most, prisoner cases, "the majority's holding could be understood to suggest a general rule requiring pro bono counsel in deliberate-indifference cases." *Id.* at 768 (Sykes, J., dissenting).

More recent decisions suggest that in cases involving complex medical or scientific evidence and which also require expert testimony to prove an element of the plaintiff's claim, counsel must be recruited. *Henderson*, 755 F.3d at 566 ("Expert medical evidence is required to prove this aspect of his claim. For example, as the district court noted, Henderson's only evidence that his kidney disease was improperly treated comes from his lab results, 'which he, as a layman, clearly cannot properly interpret for a jury,' and Henderson does not even know whether he has been taking renal medications all along for his kidney disease. In addition, as an inmate, Henderson lacked the ability to engage a medical expert. Given Henderson's capabilities, his incarceration, and the legal and factual complexities of the case, the district court abused its discretion by denying Henderson's first two

requests for appointment of counsel."); *Dewitt v. Corizon, Inc.*, 760 F.3d 654, 658 (7th Cir. 2014) (holding that court abused its discretion in failing to recruit counsel where "the case presents complicated medical matters, involves varying recommended courses of treatment by numerous physicians, and required discovery into what constitutes reasonable care for medical professionals"). Indeed, even more recent decisions suggest that in cases that require expert testimony, not only should the district judge recruit counsel to represent the plaintiff, but the judge should also either use the prestige of his office to recruit an expert able to support his claim without pay, or appoint an expert under Fed. R. Evid. 706 and order the defendant to pay. *Rowe v. Gibson*, 798 F.3d 622, 631–32 (7th Cir. 2015); *James v. Eli*, 846 F.3d 951, 954 (7th Cir. 2017) ("If a pro se plaintiff in such a case is unable despite his best efforts to obtain a lawyer and a medical expert, and if the case would have a chance of success were the plaintiff represented by counsel, the trial judge should endeavor to obtain them for him.").

As I have observed in two previous unpublished decisions, "[n]oticeably absent from the list of factors *Pruitt* instructs district courts to consider are the merits and substance of the pro se plaintiff's claim." *Rivera v. Kettle Moraine Correctional Inst.*, No. 14-C-6, 2014 WL 2875897, at *4 (E.D. Wis. June 24, 2014); *Kennedy v. Huibregtse*, No. 13-C-4, 2014 WL 4924662, at *15 (E.D. Wis. Sept. 30, 2014). On appeal from an adverse judgment in a case where the district court abused its discretion in denying a motion to recruit, the Court of Appeals will consider whether "there is a *reasonable likelihood* that the presence of counsel would have made a difference in the outcome of the litigation" in assessing whether the district court's abuse of its discretion was prejudicial. *Pruitt*, 503 F.3d at 659 (italics original). But that is not an issue for the district court to consider. *Navejar*, 718 F.3d at 696 ("*Pruitt* nowhere suggests that a district court should consider whether recruiting counsel would affect the outcome of a case; instead, that inquiry is reserved for the appellate court's review for prejudice.").

In this respect, the law in this circuit appears significantly more favorable to indigent litigants than the law in other circuits, which generally allow a more searching evaluation of the merits before counsel is appointed. *See, e.g., Cookish v. Cunningham*, 787 F.2d 1, 2–3 (1st Cir. 1986) ("That the plaintiff has alleged sufficient facts to state a claim in the complaint does not in and of itself require the appointment of counsel."); *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986) (holding that in deciding whether to request an attorney to represent an indigent plaintiff they "should first determine whether the indigent's position was likely to be of substance"); *Montgomery v. Pinchak*, 294 F.3d 492, 501 (3d Cir. 2002) (holding that plaintiff's claim must have "arguable merit," meaning that plaintiff's allegations "clearly state a non-frivolous, prima facie case of deliberate indifference to a serious medical need and that the already established evidence indicates more than an 'extremely slim' chance of success on the merits"); *Mars v. Hanberry*, 752 F.2d 254, 256 (6th Cir. 1985) ("Appointment of counsel pursuant to 28 U.S.C. § 1915(d) is not appropriate when a pro se litigant's claims are frivolous, or when the chances of success are extremely slim."); *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986) ("A finding of exceptional circumstances requires an evaluation of both 'the likelihood of success on the merits [and] the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved.' "); *Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) ("The factors to be considered include the merits of a prisoner's claims, the nature and complexity of

the factual and legal issues, and the prisoner's ability to investigate the facts and present his claims.").

At one time, the law in this circuit also allowed greater consideration of the merits. In *Maclin v. Freake*, the court held that the merits of the indigent litigant's claim should be considered first by the district court in deciding whether to recruit counsel. 650 F.2d 885, 887 (7th Cir. 1981). However, in *Farmer v. Haas*, the Seventh Circuit eliminated consideration of the merits as a factor, beyond questioning whether his claim was "colorable," since "if the plaintiff doesn't even have a colorable claim, the case should be dismissed out of hand. There is no need to worry about counsel." 990 F.2d 319, 322 (7th Cir.1993); *see also Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005) (noting that "[i]n *Farmer v. Haas* we discarded *Maclin's* multifactor test in favor of the following more straightforward inquiry: 'given the difficulty of the case, did the plaintiff appear to be competent to try it himself and, if not, would the presence of counsel have made a difference in the outcome?' "). That a pro se litigant can assert a claim that can survive a motion to dismiss, however, is hardly an indication that it has sufficient merit for him to prevail. "Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." *Maclin*, 650 F.2d at 887 (citing *Miller v. Pleasure*, 296 F.2d 283 (2d Cir. 1961), *cert. denied*, 370 U.S. 964, 82 S.Ct. 1592, 8 L.Ed.2d 830 (1962)); *see also Hodge*, 802 F.2d at 60 ("If mere bald assertions by an indigent, which technically put a fact in issue and suffice to avert summary judgment, required appointment of an attorney under § 1915(d), the demand for such representation could be overwhelming.").

Relatedly, but perhaps more importantly, since the merits of the case may be difficult to assess based on the allegations of the complaint alone when the request for counsel is first made, *Pruitt* also omits any consideration of what is at stake in the litigation. Is the plaintiff seeking money damages only for alleged past pain and suffering, or does he claim a permanent injury that requires ongoing treatment and/or diminishes his capacity to earn a living and enjoy life in the future? Even more important, is he seeking injunctive relief to address an ongoing serious medical problem that remains untreated? If the plaintiff alleges only a past injury from which he is fully recovered, it would seem reasonable to ask what are the likely costs of the representation and whether the potential damages warrant the extraordinary step of having the district judge recruit counsel and potentially an expert witness to assist him. Generally, the only compensatory damages sought in such cases will be for non-economic elements, i.e., physical and emotional pain and suffering, since the cost of medical care is already borne by the prison or jail and the plaintiff's incarceration precludes any wage loss. Outside of the prison context, it is the rare case that is brought merely to recover uncertain damages for pain and suffering alone, given the high costs of litigation.

This is precisely the kind of evaluation a private attorney would conduct in deciding whether to commence a lawsuit on behalf of an individual, and it is unclear why it is not also an appropriate consideration for a district judge in deciding whether to recruit counsel for an indigent prisoner. While it is of course true that an indigent prisoner cannot pay for an attorney on his own, it is not his poverty that prevents him from obtaining an attorney. As the Second Circuit explained in *Cooper v. A. Sargenti Co., Inc.*, it is not the size of the typical plaintiff's bank account but the merits of his claim that generally determines whether he can retain an attorney to bring suit:

It is simply not true that the suits of individuals are generally financed by their personal means. Litigation long ago became so expensive that it exceeds the means of all but a tiny fraction of the population. As a general proposition, the availability of counsel for claims by individuals is determined less by the wealth of the claimant than by the merits of the claim. The vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings. In addition to the contingency arrangement, there are statutes, including 42 U.S.C. § 1988, which guarantee pay to a prevailing lawyer at the expense of the adversary. Under these statutes, if the claim will prevail, the lawyer will be well paid without expense to the client, even though the lawsuit may involve only matters of principle without monetary award. Thus, in society at large, it is not so much the comparative wealth of potential claimants that determines whether they can succeed in obtaining the services of counsel, but the likely merits of their claim. If the claim has likely merit, a lawyer can take it with considerable confidence in being reasonably paid—sometimes very well paid.

877 F.2d 170, 173 (2d Cir. 1989).

And to the extent a pro se prisoner litigant's incarceration prevents him from bringing his claim to the attention of attorneys who have expertise in the particular area of law in which his claim arises, *Cooper* offers a suggestion for addressing this problem that stops short of requiring the judge to recruit counsel for him: "Thus a useful endeavor of courts (perhaps assisted by bar associations) in screening such applications would be to create mechanisms to insure that such claims of prisoners and other indigents be brought meaningfully to the attention of that segment of the bar which is economically motivated to assume representation in anticipation of winning contingent, or court-awarded, fees." *Id.* at 174. Providing such a service, the court explained, would better serve the public, the bar and the cause of justice than requiring judges to recruit counsel for every indigent litigant with a colorable claim beyond his competence to litigate:

> Courts do not perform a useful service if they appoint a volunteer lawyer to a case which a private lawyer would not take if it were brought to his or her attention. Nor do courts perform a socially justified function when they request the services of a volunteer lawyer for a meritless case that no lawyer would take were the plaintiff not indigent. Courts would, however, significantly advance the justified claims of the poor if they established mechanisms to insure that the claims of indigent, disadvantaged litigants will be reviewed by lawyers whose business is to pursue claims of similar nature. Such a brokerage service would be likely to find counsel for many with meritorious claims.

*Id.*

There is also a question of fairness to defendants. Recruitment of counsel for indigent plaintiffs with merely colorable but complex claims can often increase the costs of defense above any recovery the plaintiff could expect even if he prevails. This is especially true when, as is usually the case, the representation is provided by a large firm seeking litigation experience for its younger lawyers. Such firms rightfully take pride in their zealous representation of their paying clients, and are unlikely to be less zealous when representing an indigent prisoner at the request of a federal judge before whom they regularly appear. Attorneys fees and costs attributable to discovery alone in any federal case, but especially in a product liability case like

this, can quickly exceed any potential recovery and force reciprocal costs and attorneys fees on the defendant. The addition of expert witnesses, especially if the cost of the plaintiff's expert is shifted to the defendant pursuant to Fed. R. Evid. 706(c)(2), will increase the costs of defense by an even greater magnitude.

As noted above, law firms that specialize in product liability law decide to take on such cases based on their own careful assessment of the potential recovery and the likely litigation costs. Because they invest their own time and money in the case, they have a strong incentive to pursue only cases that have a reasonable likelihood of success as compared to the potential recovery. Even where a prevailing plaintiff is automatically entitled to attorneys fees and costs under 42 U.S.C. § 1988, the firm's own economic self-interest protects would-be defendants from having to expend large sums in litigation costs to defend weak and/or insubstantial claims. But when the decision is made to take the case not based on the firm's own assessment of the economic viability of the case but because a federal judge has requested the firm to do so in order to fulfill its ethical obligation, no such protection exists. As a result, by recruiting counsel for such plaintiffs, the court substantially increases the plaintiff's leverage in settlement discussions with the defendant. It would therefore seem reasonable to question whether closer scrutiny should be made of the merits and what is at stake in a case before a judge uses his office to recruit a "volunteer" attorney to represent the plaintiff.

Yet, as explained above, that is not the current law in this circuit. Once an indigent plaintiff has made the threshold showing of a reasonable effort to retain counsel on his own, I am to turn to "the two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims him-

self." *Pruitt*, 503 F.3d at 655. It is to that inquiry that I now turn.

■ Considering first the competency of the plaintiff, I note that Cole is an experienced litigator. He has represented himself in two previous cases he brought in this district in 2008. In Case No. 08–cv–0695, Cole sued three correctional officers and six members of the HSU at Waupun Correctional Institution for unconstitutional conditions of confinement and deliberate indifference to his serious medical needs. And in Case No. 08–cv–1082, he sued a correctional officer for sexual harassment, retaliation and denial of access to the courts. Although Cole lost at summary judgment in both cases, the dockets reflect filings by Cole of motions to compel, interrogatories, amended pleadings, and responses to defense summary judgment motions and proposed findings of fact, though in the latter case, his response to the defendant's motion for summary judgment consisted of collections of song lyrics. In both cases, his requests for appointment of counsel were denied based on the quality of his filings and the relatively straightforward nature of his claims. No. 08–cv–0695, (ECF No. 18 at 4.); No. 08–cv–1082, (ECF No. 11 at 7.) His filings in this case also reflect a competence above that of most of the inmates who litigate in federal courts. He has been able to coherently present his claims and arguments to the court to this point. Cole has presented no evidence of physical or mental disability that would interfere in his ability to communicate with others, nor is there any evidence of language problems that would prevent him from doing so. To be sure, he would benefit from having an attorney, but that is not the test. Otherwise, every prisoner would be entitled to court-recruited counsel to bring their personal lawsuits.

As to the complexity of the case, I have already noted that product liability law-

suits against drug manufacturers over FDA-approved drugs are complex and difficult even for most lawyers. But the factual issues concerning whether Cole suffered any significant effects traceable to his use of Risperdal that are raised in Janssen's motion for summary judgment are not complex. Indeed, they may be resolvable by a review of the medical records, copies of which Janssen has filed with the court and provided to Cole. (ECF No. 144–1at 4.) Cole claims that he has swollen breasts and has been advised he needs surgery. Janssen disputes this contention and claims that other than the normal and relatively mild side-effects disclosed in its FDA-approved label, which may be attributable to other causes, there is no evidence Cole has a serious medical problem. His medical records reveal he does not have gynecomastia and there is no indication he needs treatment. In fact, Janssen at least suggests that Cole's complaints were precipitated by his viewing of a law firm's television ad soliciting clients with potential Risperdal claims. Janssen also notes that Cole "candidly admits that he often pretended to suffer from mental illness and other maladies in the hopes of being transferred to the less restrictive Wisconsin Resource Center or to change things up in his daily routine." (ECF No. 133 at 3.)

Under these circumstances, I conclude that Cole's motion for recruitment of counsel to assist him in responding to Janssen's motion for summary judgment should be denied. Cole is more than capable of pointing to those sections of his medical records that support his allegations of significant impairment or injury. He knows or should know his own history. If he is unable at this stage to produce some evidence from which a reasonable jury could find that he has in fact suffered harm that could be attributable to Risperdal, it makes little sense to recruit counsel to assist him in attempting to prove Risperdal is the actual cause. Absent such evidence, his claim is factually frivolous.

I also note, however, that even if Cole's records do reveal significant impairment or severe symptoms that could be attributable to Risperdal use, it is unlikely the court will be able to convince a law firm to take on a case that even firms with expertise in Risperdal litigation have declined. This is not because Wisconsin lawyers are not generous in contributing their time and money to representing indigent prisoners at the request of the courts in this district, as well as to other causes. But there are limits. The time and money it would take to represent a plaintiff in a case of this kind is beyond what courts can reasonably expect a law firm to expend without any hope of recovery. Cole's status as a prisoner does not entitle him to benefits that law abiding citizens do not have.

This is not to deny that there are important benefits that accrue from pro bono litigation, especially on behalf of prisoners. Prison lawsuits have on occasion exposed inhumane conditions to which prisoners have been subjected and have brought to light abusive behavior by guards. When they do so, they benefit not only the individual prisoners who have suffered under such conditions, but also the entire prison population and the larger public whose members want humane prisons and into which most prisoners are eventually released. But, as one commentator has noted, we should not kid ourselves into thinking that all indigent litigation is beneficial:

> By providing free representation to the indigent, the opportunity for abuse is extensive. Such abuse will come from both the indigent and the attorney. Considering the multi-million dollar civil judgments that are awarded daily, it is not difficult to imagine droves of indigents seeking to take part in "get rich quick" schemes. In fact, as mandatory

free representation increases, so will the indigent's "need" for representation as they file more and more suits. As this "need" increases, bar associations and/or the courts will mandate more pro bono hours. It is hard to imagine a stop to this cycle since the indigent will simply have nothing to lose and potentially millions to gain.

B. George Ballman, Jr., *Amended Rule 6.1: Another Move Towards Mandatory Pro Bono? Is That What We Want?*, 7 GEO. J. LEGAL ETHICS 1139, 1160 (1994).

Cole's lawsuit against Janssen, even if meritorious, will benefit only Cole. There are already thousands of lawsuits against Janssen asserting similar claims that are certain to insure whatever public benefit might come out of such actions is realized. This court cannot force a lawyer to take Cole's case against the lawyer's will anymore than it can force a contractor to build him a house. For this reason as well I conclude that Cole's motion for recruitment of counsel should be denied.

### ORDER

**IT IS THEREFORE ORDERED** the plaintiff's motion for reconsideration of his motion to appoint counsel (ECF No. 140) is **DENIED**. Plaintiff's response to the defendant's motion for summary judgment is due forty-five (45) days from the date of this order.